UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
NEW ALBANY DIVISION

*Electronically Filed*

| | |
|---|---|
| AMERICAN COMMERCIAL BARGE LINE LLC | )<br>)<br>) |
| PLAINTIFF | )<br>) |
| v. | )  Case No. _____<br>) |
| LOUIS DREYFUS COMPANY LLC | )<br>)<br>) |
| DEFENDANT | ) |

## COMPLAINT

Plaintiff American Commercial Barge Line LLC ("ACBL"), by counsel, for its Complaint against Defendant Louis Dreyfus Company LLC ("LDC"), hereby alleges and states as follows:

## PARTIES

1. Plaintiff American Commercial Barge Line LLC ("ACBL") is a limited liability company organized under the laws of Delaware. The sole member of ACBL is Commercial Barge Line Company, a Delaware corporation with its principal place of business at 1701 East Market Street, Jeffersonville, IN 47130.

2. LDC is a limited liability company organized under the laws of Delaware with its principal place of business at 40 Danbury Road, Wilton, Connecticut 06897.

## JURISDICTION AND VENUE

3. This Court possesses original subject matter jurisdiction over this action pursuant to Article III, Section 2, of the United States Constitution and 28 U.S.C. § 1333. The controversy between the parties concerns amounts owed under maritime contracts for the barge transportation of commodities on the Mississippi River System and, therefore, falls within the Court's admiralty

or maritime jurisdiction. The claims pleaded herein are admiralty or maritime claims for purposes of Federal Rule of Civil Procedure 9(h).

4. Venue and personal jurisdiction are proper in this Court. LDC consented to the forum-selection clause in the parties' Contracts of Affreightment designating the U.S. District Court for the Southern District of Indiana as the exclusive venue for any action or proceeding arising out of or in connection with those Contracts. Moreover, to the extent the general maritime law of the United States is inapplicable, the Contracts of Affreightment are governed by Indiana law. LDC regularly entered into contracts and conducts business with ACBL through ACBL's principal office located in Jeffersonville, Indiana.

## FACTUAL ALLEGATIONS

5. ACBL is a marine transportation company engaged in the business of transporting a variety of dry and liquid bulk commodities along U.S. inland waterways.

6. LDC is part of a global merchant, processing, and shipping firm for agricultural goods which purports to transport approximately 80 million tons of products annually. Grain (wheat, corn, soybeans, rice, etc.) comprises a substantial volume of the agricultural products that LDC processes and distributes. LDC's grain distribution business requires a significant amount of marine transportation. Accordingly, LDC contracts with marine transportation carriers, like ACBL, to move LDC's inventory of grain in bulk shipments from LDC-owned loading facilities to grain elevators, river ports, unloading terminals, and export facilities situated at different points along the inland waterways.

7. For each barge shipment, ACBL and every shipper including LDC enter into a Contract of Affreightment, for the transport of LDC's grain from various origin points on the Mississippi River System to LDC's Port Allen grain elevator located in Port Allen, Louisiana.

8. Each Contract of Affreightment incorporates by reference and attachment "ACBL Additional Contract Terms and Conditions" which set forth, *inter alia*, conditions of payment and freight rates, conditions constituting transfer of possession of ACBL barges to LDC and third parties, barge placement and release, terms of loading and unloading cargoes, issuance of bills of lading, and terms of consignment.

9. Consistent with industry practice and the parties' standard practices, the Contract of Affreightment and ACBL Additional Terms and Conditions are provided by ACBL to LDC for each order, but are not physically signed by either party. The Contract of Affreightment states that "Shipper [LDC] shall be deemed to have accepted all terms and conditions of this Contract upon placement of a barge by ACBL at Shipper's [LDC's] instructions." LDC confirms the purchase of barge freight via a "Confirmation of Purchase (Barge Freight)" and requests that ACBL issue a Bill of Lading. ACBL then issues an "Order Bill of Lading" confirming the barge number, description of cargo, cargo point of origin, point of destination, and the Shipper's consignee(s).

10. The Order Bill of Lading states "that every service to be performed hereunder shall be subject to all the terms and conditions contained in the Contract of Affreightment between Shipper and Carrier, which terms and conditions are hereby agreed to by the Shipper and Shipper's consignees and assigns."

11. While the destination listed on each Contract of Affreightment and Confirmation of Purchase is the area of the lower Mississippi River identified as "Baton Rouge Thru Myrtle Grove, LA," LDC designates as the final destination on the Bill of Lading Request LDC's grain elevator in Port Allen, Louisiana. The LDC Port Allen grain elevator, however, does not accept direct barge delivery, meaning that ACBL barges are unable to dock directly at the grain elevator (the destination unloading terminal). Instead, ACBL must necessarily hold each barge destined

for LDC's Port Allen grain elevator at ACBL's own nearby Tiger Fleet, where the barge begins to accrue demurrage charges on LDC's account. The barge remains at Tiger Fleet until LDC, through its designated service fleet operated by Cargo Carriers Incorporated ("CCI"), orders ACBL to transfer the barge to the CCI fleet. The CCI fleet is a holding area for barges adjacent to the shoreline where they are staged and prepared for unloading at LDC's Port Allen grain elevator. ACBL holds barges at Tiger Fleet for LDC's convenience in coordinating unloading at Port Allen. LDC's Port Allen grain elevator is only large enough to accommodate a few barges at a time, and the CCI fleet would be overwhelm if confronted with the full, unregulated volume of barge deliveries destined for Port Allen.

12.     Once an ACBL barge is brought to the CCI fleet, CCI moves the barge within its fleet, shifts the barge to LDC's Port Allen grain elevator for unloading and then shifts the barge back to the CCI fleet before it is then released to ACBL. The CCI fleet assesses charges for on and off tow fees, fleeting costs, and switching between fleet and unloading points (the "accessorial charges"). The CCI fleet subjects each barge to at least four shift movements after its transfer from Tiger Fleet.

13.     In addition to receiving delivery of its own cargo at Port Allen, LDC's grain elevator serves as an export facility for the cargo of numerous other third-party shippers. When ACBL agrees to transport the cargo for a third-party shipper, and the third-party shipper decides that the ACBL barge will be delivered to Port Allen, LDC is designated as the Consignee on the Order Bill of Lading. As discussed above, the Order Bill of Lading incorporates and binds the Consignee to the terms and conditions of the Contract of Affrieghtment. Each Order Bill of Lading for such third-party shipments is provided to LDC as Consignee at final destination. Moreover, LDC has knowledge of those applicable terms and conditions under the Contract of Affreightment

4

and Order Bill of Lading through its direct use of ACBL as a barge carrier for LDC cargo. As Consignee, LDC is contractually responsible for accessorial charges billed to ACBL as a result of LDC's requirement that third-party shipments destined for Port Allen be placed with the CCI fleet.

14. Until March 2019, ACBL paid out of its own account for shift movements and related accessorial charges that it was not obligated to pay on ACBL barges that it transferred, pursuant to LDC's instructions, to the CCI fleet. ACBL paid these charges despite the terms of the Contract of Affreightment making clear that ACBL was not obligated to pay these charges. ACBL paid these charges to CCI because under maritime law, CCI would have the right to levy a lien against any delinquent ACBL barge. Barges with outstanding liens are potentially subject to arrest and forced sale.

15. On February 8, 2019, ACBL's Senior Vice President of Sales and Customer Service, Robert Blocker, wrote a letter to "All Parties Involved in ACBL Grain Freight Trade" notifying shippers and consignees within the industry—including LDC—that ACBL would no longer pay out of its own account accessorial charges arising from shippers or consignees choosing as a destination terminal "a fleet instead of an unloading point."

16. In a response letter dated February 25, 2019, Kimberly Hawks, LDC's Commercial Manager of US Eastern Supply Chain – Grains and Oilseeds, notified ACBL that LDC would not comply with ACBL's letter by accepting responsibility for the accessorial charges.

17. Beginning March 1, 2019, ACBL invoiced LDC for all assessorial charges imposed by CCI for shipments unloaded at LDC's Port Allen grain elevator.

18. LDC has refused to pay any accessorial charges associated with shift movements and tow fees imposed by CCI on ACBL barges delivered to the CCI fleet at LDC's request and as a result of LDC's inability or unwillingness to accept delivery directly at Port Allen.

## COUNT I
## BREACH OF CONTRACT

19. ACBL incorporates the allegations set forth in paragraphs 1 through 18 as if fully set forth herein.

20. Pursuant to the Contract of Affreightment, ACBL is only obligated to pay from its account one shift movement to/from the dock at origin and one shift to/from the dock at destination. Despite the contractual specified destination as Port Allen, LDC requires ACBL to hold all barges—whether carrying its own cargo or the cargo of a third-party shipper—at Tiger Fleet pending LDC's order for the barges to be transferred to CCI fleet where they are staged for unloading at the grain elevator. LDC's obligation, as Shipper or Shipper's Consignee, to pay additional charges are outlined in Section 11 of the Contract of Affreightment:

> **FREIGHT RATE AND OTHER CHARGES.** Shipper agrees to pay freight, demurrage and all other charges as provided herein. Freight rates apply for line haul transportation only and do not include the cost of: ballasting a barge; disposing of excess cargo; drayage; elevation; loading, stowage or unloading of cargo; opening or closing barge covers; removal or replacement of barge covers; stacking or restacking of barge covers; tollage; sheddage; dockage; wharfage; or any terminal expense at either origin or destination. *Freight rates include an allowance for one (1) shift of ACBL's barge to/from dock at origin and one (1) shift of ACBL's barge to/from dock at destination; with a maximum allowance of $500 per shift for all shifting to/from all docks having an origin south of Cairo, IL. All other shifting costs are for Shipper's account.* All standby charges are for Shipper's account. ACBL reserves the right to charge an override fee in the event Shipper requests a barge to be delivered to a destination other than Baton Rouge through Myrtle Grove. All other expenses reasonably required for the movement of cargo, which are not expressly included in the freight rate, shall be for the account of Shipper, including without limitation, the amount of any user charge/fee or toll, imposed, levied or collected for use of the Mississippi River or its tributaries, or the use of the Intracoastal Waterways, or of the locks, dams, ports, or harbors in said river systems. Cargo, other than as specified in Section 1, may be loaded only with the prior consent of ACBL, and subject to mutually agreeable rates, as confirmed by written notice to Shipper.

(emphasis added).

21. Following ABCL's movement of a barge from Tiger Fleet to the CCI fleet, LDC is obligated to pay for all shift movements and associated accessorial fees imposed by CCI, including, but not limited to, switching the barge in and out of CCI fleet, internal movements within CCI fleet, and moving the barge to and from LDC's Port Allen grain elevator.

22. ACBL barges destined for LDC's Port Allen grain elevator are constructively placed in LDC's possession upon arrival at Tiger Fleet, while LDC coordinates their unloading schedule via the CCI fleet. Section 14 of the Contract of Affreightment provides:

> **BARGE PLACEMENT AND RELEASE:** ACBL shall deliver ACBL's barge to a dock, vessel or fleet as designated by Shipper for loading or unloading, and the barge shall be deemed actually placed in possession of Shipper at the time of physical delivery to the designated dock, fleet or vessel ("actual placement"). In the event that the dock, vessel or fleet designated by Shipper is unable to accept ACBL's barge for any reason at the time it is tendered by ACBL, ACBL may deliver the barge to an alternate location of ACBL's choice where space is available, and the barge shall be deemed constructively placed in the possession of Shipper at the time of physical delivery to the alternate location ("constructive placement"). Shipper shall be responsible for all additional costs associated with moving the barge to the alternate location and utilizing the alternate location. . . . .

23. In addition to the express exclusion of accessorial charges from the agreed-upon freight rate, barges placed in the constructive possession of LDC, like those at Tiger Fleet, are to be held without charge to ACBL. Specifically, Section 16 of the Contract of Affreightment states:

> Upon delivery of ACBL's barge to the dock, vessel or fleet designated by Shipper or to an alternate location as provided in Section 14, Shipper shall be deemed to be in possession of the barge and any cargo on board and to be responsible for their safety until the barge is released to and removed by ACBL, regardless of whether Shipper owns or operates the dock, vessel, fleet or alternate location. *Barges and cargoes in Shipper's possession under this provision shall be held without charge to ACBL*. . . .

(emphasis added).

24. Pursuant to the Contract of Affreightment, demurrage on a barge begins to run when the barge arrives at Tiger Fleet. While the barge is held at Tiger Fleet awaiting LDC's

transfer order, and throughout the barges time at the CCI fleet until it is unloaded at LDC's Port Allen grain elevator and released to ACBL, ACBL has no ability to use the laden barge of its own purposes, and LDC is responsible for any demurrage incurred.  Indeed, LDC—as Shipper and Shipper's Consignee—has paid demurrage charges on barges for the time in which they are held at Tiger Fleet.  Accordingly, LDC has waived any argument that it is not bound by the terms and conditions of the Contract of Affreightment and Order Bill of Lading.  LDC has further waived any argument that it is not in constructive possession from the moment barges are held at Tiger Fleet on LDC's order and for its convenience.

25. ACBL has no control over the shift movements of its barges while at the CCI fleet or at the Port Allen grain elevator.

26. Since March 1, 2019, CCI fleet has charged ACBL accessorial charges for barges placed at the CCI fleet.  ACBL has paid these charges to prevent CCI from placing a lien on ACBL's barges.

27. ACBL has issued invoices to LDC for payments that LDC, as Shipper or Shipper's Consignee, owes to ACBL for accessorial charges that ACBL paid to CCI for barges transferred to the CCI fleet at LDC's direction and on LDC's account.

28. Despite due demand, LDC has not paid the outstanding invoices arising from the CCI fleet charges.

29. LDC's non-payment for accessorial charges constitutes breach of the Contracts of Affrieghtment and Order Bills of Lading.

30. All conditions precedent required of ACBL under the Contracts of Affrieghtment and Order Bills of Lading have been performed.

31. As a result of LDC's breach of its obligations to ACBL, beginning on March 1, 2019, ACBL has and continues to suffer damages in the principal amount of $334,053.64. Pursuant to Section 12 of the Contract of Affreightment, interest on the invoiced and unpaid amounts is accruing at a rate of 1.5% per month. Additional damages continue to be incurred.

## COUNT II
## DECLARATORY JUDGMENT

32. ACBL incorporates the allegations set forth in paragraphs 1 through 31 as if fully set forth herein.

33. Pursuant to 28 U.S.C. §§ 2201 and 2202, an actual controversy exists between ACBL and LDC regarding their respective rights and obligations under the Contracts of Affreightment and Order Bills of Lading.

34. LDC continues to receive its own cargo and the cargo of third-party shippers carried by ACBL barges subject Contracts of Affreighment and Order Bills of Lading at LDC's Port Allen grain elevator.

35. Moreover, LDC continues to require that all such ACBL barge shipments destined for Port Allen be held in Tiger Fleet and then transferred upon LDC's order to the CCI fleet, causing ACBL to be assessed CCI charges related to the movement of those barges, including, but not limited to, switching the barge in and out of CCI fleet, internal movements within CCI fleet, and moving the barge to and from LDC's Port Allen grain elevator. Those accessorial charges have been and continue to be incurred on LDC's account.

36. ACBL seeks a declaratory judgment that LDC—as Shipper or Shipper's Consignee—is liable to pay ACBL under the Contracts of Affreightment and Order Bills of Lading for all accessorial charges imposed by CCI.

## COUNT III
## UNJUST ENRICHMENT
## (Pleaded in the Alternative)

37. ACBL incorporates the allegations set forth in paragraphs 1 through 36 as if fully set forth herein.

38. At all times relevant to this litigation, ACBL maintains that LDC has been contractually obligated to pay accessorial fees that it caused to accrue against ACBL barges at the CCI fleet as a result of shift movements and related expenses imposed by CCI. ACBL has had no choice but to pay such accessorial charges to prevent CCI from levying liens against ACBL's barges.

39. If, however, it is determined that LDC is not bound by the terms and conditions of the Contracts of Affreightment and Order Bills of Lading, ACBL has still conferred a measurable benefit upon LDC by complying with LDC's direction to transfer ACBL barges to CCI fleet, rather than delivering them directly to the Port Allen grain elevator. ACBL has paid out of its own account for shift movement and related assessorial charges arising from LDC's instructions to deliver the barges to CCI fleet.

40. ACBL expected LDC to compensate it for any accessorial charges incurred as a result of conferring this benefit on LDC, but LDC has refused to pay accessorial charges that it caused to be accrued against ACBL barges. ACBL made clear when the parties first entered into the contracts and again on February 8, 2019, that ACBL expects LDC to either pay the CCI fleet charges directly or otherwise reimburse ACBL for shift movements and related accessorial charges LDC causes ACBL's barges to incur.

41. As a result of LDC's failure to pay accessorial charges accrued against ACBL barges, LDC has unjustly enriched itself in the amount of $334,053.64 from March 1, 2019 until

the present. LDC continues to unjustly enrich itself at ACBL's expense. Allowing LDC to retain these benefits without compensating ACBL would be unjust.

WHEREFORE, Plaintiff American Commercial Barge Line LLC, prays for judgment as follows:

    A.    Judgment in favor of ACBL and against LDC in the amount of $334,053.64 and further contractual damages to be established at trial and for any other and further amount that later calculation may demonstrate as appropriate;

    B.    A declaration of LDC's liability to ACBL under the Contracts of Affreightment and Order Bills of Lading for past and future accessorial charges imposed by the CCI fleet.

    C.    An award of its costs and expenses incurred herein, including reasonable attorneys' fees.

    D.    An award of pre-judgment and post-judgment interest; and

    E.    Any and all other legal and equitable relief to which it may be entitled.

    Respectfully submitted,

/s/ Donald J. Kelly
Donald J. Kelly
Sean G. Williamson
WYATT, TARRANT & COMBS, LLP
400 West Market Street, Suite 2000
Louisville, Kentucky 40202
502.589.5235
dkelly@wyattfirm.com
swilliamson@wyattfirm.com

*Counsel for Plaintiff American Commercial Barge Line LLC*

100141275